[Cite as *State v. Carter*, 2014-Ohio-4174.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

STATE OF OHIO,                            :

    Plaintiff-Appellee,                 :        CASE NO.  CA2013-12-228

    - vs -                                      :        O P I N I O N
                                                        9/22/2014
                                        :

JOHN TYRON CARTER,                        :

    Defendant-Appellant.                :

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2013-06-0927

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael A. Oster, Jr., Government
Services Center, 315 High Street, Hamilton, Ohio 45011, for plaintiff-appellee

Christopher P. Frederick, 304 North Second Street, Hamilton, Ohio 45011, for defendant-
appellant

**PIPER, J.**

{¶ 1} Defendant-appellant, John Carter, appeals his convictions and sentence in the

Butler County Court of Common Pleas for two counts of unlawful sexual conduct with a

minor.

{¶ 2} A.J., a 14-year-old girl, along with her mother and sister, moved into Carter's

home in August, 2012 when Carter was 33 years old.  Carter was a family friend, and offered

to give A.J.'s family his bedroom in which to live. Carter's home was also occupied by several people so that when A.J. and her family moved into his bedroom, Carter began sleeping in the living room of his home. When A.J.'s mother began a relationship with another house member and began staying in his room, Carter moved back into his bedroom. While staying in both the living room and in the bedroom, Carter and A.J. engaged in sexual relations.

{¶ 3} After A.J.'s family moved out of the house, A.J.'s mother found text messages on A.J.'s phone that indicated the sexual relationship between A.J. and Carter. A.J.'s mother took the text messages to the Hamilton Police Department, and filed a report in December 2012. Detective Mark Nichols began an investigation. At first, A.J. denied any sexual relationship with Carter. However, she eventually admitted that she and Carter engaged in sexual conduct.

{¶ 4} Carter was indicted on four counts of unlawful sexual conduct with a minor, with each count specific to an act of fellatio, cunnilingus, vaginal intercourse, and anal intercourse. Carter pled not guilty to the charges, and the matter proceeded to a two-day jury trial. The jury found Carter guilty of counts one and three, specific to fellatio and vaginal intercourse, and not-guilty of count two specific to cunnilingus. The jury could not reach a unanimous verdict as to count four, specific to anal intercourse. The trial court sentenced Carter, who had a previous conviction for corruption of a minor, to seven years on count one and five years on count three. The trial court ordered the sentences to run consecutive for an aggregate sentence of 12 years. Carter now appeals his convictions and sentence, raising the following assignment of error:

{¶ 5} MR. CARTER'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 6} Carter argues in his sole assignment of error that his convictions were against

- 2 -

the manifest weight of the evidence.

{¶ 7} A manifest weight challenge examines the inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other. *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298.

> In determining whether a conviction is against the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Cummings*, 12th Dist. Butler No. CA2006-09-224, 2007-Ohio-4970, ¶ 12.

{¶ 8} While appellate review includes the responsibility to consider the credibility of witnesses and the weight given to the evidence, "these issues are primarily matters for the trier of fact to decide since the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence." *State v. Walker*, 12th Dist. Butler No. CA2006-04-085, 2007-Ohio-911, ¶ 26. Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances to correct a manifest miscarriage of justice, and only when the evidence presented at trial weighs heavily in favor of acquittal. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 9} Carter was convicted of two counts of unlawful sexual conduct with a minor in violation of R.C. 2907.04(A), which provides, "no person who is eighteen years of age or older shall engage in sexual conduct with another, who is not the spouse of the offender, when the offender knows the other person is thirteen years of age or older but less than sixteen years of age, or the offender is reckless in that regard."

{¶ 10} During the state's case-in-chief, it presented several witnesses who testified to the incidents in question. First to testify was A.J., who testified that when she was 14 years old, she and her mother and sister moved into Carter's home. A.J. testified that she and

Carter engaged in sexual conduct, and that it eventually progressed into sexual intercourse. A.J. recalled that the sexual conduct occurred on a regular basis in Carter's house, including the living room, basement, and Carter's bedroom.

{¶ 11} A.J. admitted that she was untruthful when first asked about her relationship with Carter. A.J. testified that she had several things in common with Carter, and that the two were close friends so that she did not want Carter to get into trouble for their relationship. A.J. also testified that she did not want to anger her family by admitting to her sexual relationship with Carter so that she kept their relationship a secret and denied the sexual conduct when first questioned about it.

{¶ 12} On cross-examination, Carter's counsel questioned A.J. about how her story had changed, and that she did not admit to the sexual conduct at first when questioned about it. Again, A.J. reiterated that she was not honest about the relationship at first out of fear of getting in trouble for her actions, and out of fear that Carter would be punished for his conduct.

{¶ 13} The state next presented the testimony of A.J.'s mother who testified that she became suspicious of a sexual relationship between A.J. and Carter when she saw the two together on the living room couch touching each other. A.J.'s mother testified that she confronted the two, and that they denied any inappropriate conduct, claiming instead that they were best friends. A.J.'s mother testified that her suspicions were finally confirmed when she found A.J.'s phone, which contained text messages between A.J. and Carter regarding their sexual relationship. A.J.'s mother also testified to taking the text messages to the police, and filing a report against Carter.

{¶ 14} The state then called the boyfriend of A.J.'s mother, who was also living in the house at the time the sexual relationship occurred between A.J. and Carter. The boyfriend testified that he saw A.J. and Carter laying on a bed or the couch together multiple times "like

husband and wife or boyfriend and girlfriend." He also testified that he observed A.J. and Carter "like hugged up and everything like that, like cradling each other." The boyfriend also testified that he confronted Carter, and that Carter would change the subject every time he was questioned about his relationship with A.J.

{¶ 15} Detective Mark Nichols testified on behalf of the state regarding his investigation into the matter. Detective Nichols testified that once he received the text messages and report from A.J.'s mother, he interviewed Carter. Detective Nichols testified that Carter admitted that he had received the text messages from A.J. and that he had sent the replies to A.J., as those text messages were given to the police by A.J.'s mother. Detective Nichols then testified to the sexual content of the messages, including A.J. asking Carter, "how come you cum so fast?," Carter warning A.J. to be careful with what she was saying because the texts were stored on the network and could be read by others, and A.J. telling Carter, "baby, we have a lot more we need to try." Detective Nichols testified that Carter tried to explain the texts by stating that he thought they were from someone else when he read and responded to them.

{¶ 16} Detective Nichols testified on cross-examination that the first time he interviewed A.J. about her relationship with Carter, she told him that she and Carter were only friends and never had a sexual relationship. Detective Nichols also testified that in his 11 years of experience in investigating child sexual abuse cases, he was not surprised that A.J. hid the nature of her relationship with Carter at first, and that such dishonesty by the victim is a common occurrence.

{¶ 17} Before the state rested, it called Deputy Michael Jacobs of the Butler County Sheriff's Office, Division of Sex Offender Registration and Notification. Deputy Jacobs testified that Carter had registered with the Butler County Sheriff's Office as a sexual-oriented offender from 1998 to 2010 because of a prior conviction for corruption of a minor.

{¶ 18} Carter testified in his own defense, and claimed that he never had any sexual contact with A.J. and that the two were never more than friends. Carter testified that he would sit on the couch with A.J. and listen to her discuss her problems, but that he never touched her in a sexual manner while sitting on the couch, or at any other location in the home.

{¶ 19} Kenneth Smiley, who also lived in Carter's home, testified on behalf of the defense that he never witnessed any sexual contact between A.J. and Carter. Smiley described the relationship between A.J. and Carter as "casual" and that he did not believe anything "inappropriate" happened between the two. On cross-examination, Smiley testified that he spent a large portion of his time in his own bedroom, as he and his girlfriend had a young baby to take care of.

{¶ 20} In order to demonstrate that his convictions were against the manifest weight of the evidence, Carter argues that he did not have any sexual contact with A.J. However, the jury convicted Carter of unlawful sexual conduct with a minor, thereby rejecting Carter's claim that he never engaged in sexual conduct with A.J. Carter also challenges his convictions, arguing that A.J.'s testimony lacked credibility because her story changed throughout the course of the investigation. However, the jury heard testimony that A.J. was not honest about the nature of her relationship with Carter out of fear that either she or he would receive reprisal, and she wanted to avoid getting anyone into trouble. By virtue of its verdict of guilty on some counts, and not-guilty on another, the jury obviously weighed the evidence and considered which witnesses were credible, and which were not, specific to each count in the indictment.

{¶ 21} The jury made its determination after accepting testimony from five witnesses during the state's case-in-chief, as well as two witnesses in Carter's defense. "Upon acknowledging that such extensive testimony will inevitably produce some inconsistent or

conflicting assertions, we recognize the sound principal [sic] that the trier of fact is best positioned to weigh the credibility of the individual witness and reach a conclusion based on the totality of the evidence." *State v. Hernandez*, 12th Dist. Warren No. CA2010-10-098, 2011-Ohio-3765, ¶ 41, quoting *State v. Dunn*, 9th Dist. Lorain No. 04CA008549, 2005-Ohio-1270, ¶ 10. The jury heard all of the testimony, considered the evidence, and found the state's theory of the case and its witnesses credible on two of the charges so that we will not disturb such a finding on appeal.

{¶ 22} Having found that Carter's convictions were not rendered against the manifest weight of the evidence, we overrule his assignment of error.

{¶ 23} Judgment affirmed.

RINGLAND, P.J., and S. POWELL, J., concur.